UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JEROME BURNS, SR.,

            Petitioner,

    v.

DAVID DAVEY, Warden,[1]

            Respondent.

Case No.  13-cv-04122-YGR (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; AND DENYING CERTIFICATE OF APPEALABILITY**

      Petitioner Jerome Burns, Sr. brings the instant *pro se* habeas action under 28 U.S.C. § 2254 to challenge his 2011 conviction and sentence rendered in the Alameda County Superior Court. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES the petition for the reasons set forth below.

## I.    BACKGROUND[2]

      On May 31, 2011, an Alameda County jury convicted Petitioner of unlawful sexual intercourse by a person age 21 or older with a minor under age 16 (count 1); forcible rape (count 2); oral copulation of a person under age 16 (counts 4 & 5); using a minor for sex acts (count 6); procuring a child to engage in a lewd act (counts 7 & 8); pandering by procuring (count 10); and pimping (count 11).[3]  CT 435-436.  On June 7, 2011, the trial court found true a prior strike conviction.  CT 441.  The trial court also found Petitioner was in violation of his probation in an unrelated case and revoked probation.  RT 342-343.  On the prosecutor's motion, the trial court struck the remaining prior conviction allegations.  RT 342; CT 439.  Petitioner was sentenced to 32 years and 4 months in state prison.  CT 451-455.

---

    [1] David Davey, the current warden of the prison where Petitioner is incarcerated, has been substituted as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

    [2] The facts of the case are familiar to the parties and were set forth in the California Court of Appeal opinion.  *People v. Burns*, No. A132942, 2012 WL 6734688, *1-4 (Cal. Ct. App. Dec. 27, 2012).

    [3] At the close of evidence, on the prosecution's motion, the trial court dismissed count 3, which charged forcible rape.  *Burns*, 2012 WL 6734688, *13, n.2.  The jury found appellant not guilty on count 9, which charged human trafficking of a minor.  *Id.*; CT 436.

United States District Court
Northern District of California

1      Petitioner appealed the judgment to the California Court of Appeal alleging that: (1) his

2   defense attorneys[4] were ineffective; (2) the trial court failed to advise him of his right to discharge

3   his retained counsel; (3) the court erred in instructing the jury with CALCRIM No. 318; (4) the

4   court's prior serious felony conviction finding was unsupported by substantial evidence; (5) the

5   court failed to exercise informed discretion in setting the amount of his restitution fund fines; and

6   (6) the court erred in imposing a full, consecutive sentence for his violation of probation. *Burns*,

7   2012 WL 6734688, *1.

8      While his direct appeal was pending, Petitioner filed a separate state appellate court habeas

9   petition, which the California Court of Appeal denied in an order dated December 27, 2012. Dkt.

10   12, Ex. I.

11      In a separate order also dated December 27, 2012, the state appellate court affirmed

12   Petitioner's conviction, but remanded for resentencing with respect to his violation of probation in

13   another case. *Burns*, 2012 WL 6734688, *13; Dkt. 12, Ex. H.

14      On April 10, 2013, the California Supreme Court denied review. Dkt. 12, Ex. K.

15      Petitioner also filed a state supreme court habeas petition, which the California Supreme

16   Court denied on April 17, 2013. Dkt. 12, Ex. M.

17      On September 5, 2013, Petitioner filed the instant petition, alleging: (1) defense counsel

18   provided ineffective assistance by introducing a videotaped interview of the victim; (2) the trial

19   court failed to advise Petitioner of his right to discharge his retained counsel; and (3) the court

20   erred in instructing the jury with CALCRIM No. 318. Dkt. 1. On November 26, 2013, this Court

21   issued an Order to Show Cause.[5] Dkt. 6. Respondent filed an Answer, and Petitioner filed a

22

23      [4] Petitioner was simultaneously represented by two retained attorneys at trial.

24      [5] On January 15, 2014, Petitioner filed an amended petition. Dkt. 11. On March 13, 2014,
   Petitioner filed a document entitled, "Notice of Motion to Strike Amended Petition and Request
25   for Continuance," which the Court construed as his motion for leave to file a second amended
   petition ("SAP"). Dkt. 18. On April 8, 2014, Petitioner file his proposed SAP, which included the
26   three original claims (1) through (3) and a new claim relating to the trial court improperly
   imposing a $10,000 restitution fine. Dkt. 21. In an Order dated November 6, 2014, the Court
27   found that Petitioner's new restitution-related claim failed to state a cognizable federal claim for
   relief, and denied his request for leave to file a SAP to add such a claim. Dkt. 29. Therefore, the
28   operative petition is the original petition. Dkt. 1.

United States District Court
Northern District of California

1    Traverse.  Dkts. 12, 28.  The matter is fully briefed and ripe for adjudication.

2    **II.     LEGAL STANDARD**

3              A federal court may entertain a habeas petition from a state prisoner "only on the ground

4    that he is in custody in violation of the Constitution or laws or treaties of the United States."  28

5    U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996,

6    a district court may not grant a petition challenging a state conviction or sentence on the basis of a

7    claim that was reviewed on the merits in state court unless the state court's adjudication of the

8    claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

9    clearly established Federal law, as determined by the Supreme Court of the United States; or

10   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of

11   the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The first prong

12   applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v.*

13   *Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual

14   determinations, s*ee Miller-El v. Cockrell*,  537 U.S. 322, 340 (2003).

15             A state court decision is "contrary to" Supreme Court authority, that is, falls under the first

16   clause of section 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

17   reached by [the Supreme] Court on a question of law or if the state court decides a case differently

18   than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams (Terry)*, 529

19   U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court

20   authority, falling under the second clause of section 2254(d)(1), if it correctly identifies the

21   governing legal principle from the Supreme Court's decisions but "unreasonably applies that

22   principle to the facts of the prisoner's case."  *Id.* at 413.  The federal court on habeas review may

23   not issue the writ "simply because that court concludes in its independent judgment that the

24   relevant state-court decision applied clearly established federal law erroneously or incorrectly."

25   *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ.

26   *Id.* at 409.

27             Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will

28   not be overturned on factual grounds unless objectively unreasonable in light of the evidence

United States District Court
Northern District of California

3

1   presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v.*

2   *Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).  Moreover, "a determination of a factual issue made

3   by a State court shall be presumed to be correct," and the petitioner "shall have the burden of

4   rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C.

5   § 2254(e)(1).

6        Even if constitutional error is established, habeas relief is warranted only if the error had a

7   "substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson*,

8   532 U.S. 782, 795-96 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

9        On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating

10   state-court rulings" and "demands that state-court decisions be given the benefit of the doubt."

11   *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted).  When there is no

12   reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to

13   the last reasoned opinion.  *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v.*

14   *Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).  Thus, a federal court will "look through" the

15   unexplained orders of the state courts rejecting a petitioner's claims and analyze whether the last

16   reasoned opinion of the state court unreasonably applied Supreme Court precedent.  *See Ylst*, 501

17   U.S. at 804-06; *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  The last reasoned

18   decision in this case is the Court of Appeal's unpublished disposition issued on December 27,

19   2012.

20   **III.   DISCUSSION**

21        **A.   Ineffective Assistance of Counsel**

22        Petitioner contends his defense counsel provided ineffective assistance by presenting "as

23   the only evidence in Petitioner's behalf an hour-and-a-half long DVD of the interview of victim

24   Doe by Officers Velasquez and Contrell at the police station on December 10, 2009.  Dkt. 1 at 6.[6]

25   Petitioner claims that the evidence was "devastating" to his case because the victim's statements in

26

27        _____
         [6] Page number citations refer to those assigned by the Court's electronic case management

28   filing system and not those assigned by Petitioner.

                                                     4

the interview supported her testimony. *Id.* at 7. He further argues that defense counsel were ineffective in failing to redact it to exclude the victim's statements about his additional sex crimes against her and her allegations he was a "pimp with large operation and a drug dealer." *Id.* In his traverse, Petitioner argues that "it is hard to overstate the negative impact it must have had on [his] case for the jury to see [his] own attorneys working hand in hand with the prosecution to present evidence supporting the charges offenses as well as evidence of numerous other uncharged sex crimes and other crimes." Dkt. 28 at 15.

The state appellate court gave the following background facts relating to this claim:

> The defense played the entire 90-minute videotaped police interview of the victim.[FN3] The defense put on no other evidence. The victim's videotaped statements are summarized as follows:
>
> [FN3:] The jury was provided an 82-page transcript of the interview, to be used as an aid while watching the videotape. Both the videotape and the transcript were admitted into evidence.
>
> On the first night, when appellant took the victim to the hotel, he "seemed like a pretty cool guy. So [the victim] was like yeah I will stay with him." They did not have sex that night. The next day, a Thursday, he bought her food, then took sexually provocative pictures of her. When she objected, he said she had to pose for the pictures or she "would be back on the streets." When she tried to leave, he would tell her, "No." Appellant was "in and out all day." He went to his sister's house to post the pictures of the victim on the internet. The internet ad for the victim gave her name as Coco, a name Michael [a pimp] had given her.
>
> On Friday, appellant went to work. He returned that night with his friend, the Indian man, who gave the victim $70 in exchange for orally copulating him, while appellant waited outside. The victim said the Indian man was "the only guy that I had ever done anything with besides [appellant]."
>
> On Saturday morning, appellant told the victim to get up and grease his head. When she said, "No," he told her to leave. She replied, "No. I won't leave." She then greased his head and agreed to take off his shoes and socks. Appellant then left for work. When he returned later that night, he grabbed her hair, told her to "make daddy happy," and forced her head onto his penis for about five minutes. When she refused to cooperate, he became angry and told her to lay on the bed; she fell asleep. When she awoke he was lying on top of her with her arms pinned down and his penis in her vagina.

5

This occurred for five or 10 minutes.  When she told him to get off her, he refused.  She believed that if she screamed he would hit her.  He did not use a condom and ejaculated inside her.  When she told him she would call the police, appellant responded he did not care and said, "If I go to jail, you go to jail with me."  Appellant left in a car; the victim was so upset she "got drunk" with alcohol that was in the room.  The victim said appellant and Michael knew each other before appellant took her to the hotel; Michael had bought a car for him with the money she had made from prostituting.

The next morning, Sunday, when the victim woke up, she was naked on the bed in between appellant and a Black friend of his.  She "freaked out," did not know what to do, and went back to sleep.  When she woke up, appellant and his friend were gone.  She did not know whether they had sex with her, but she "kind of hurt down there."  The victim did not leave the hotel that day because she had nowhere to go.  She believed appellant would have called the police if he returned and she was not there.  When appellant returned with his friend, appellant told her to go into the bathroom.  Inside the bathroom, the friend, whose pants were down, told the victim to orally copulate him; she complied.  After two minutes, he told her to stop.  That night, appellant tried to take more pictures of her, but she refused.  The victim was "in a good mood because he accepted that."

The victim could not remember what happened next.  She said appellant sometimes put pills in her drinks and tried to make her drink them.  He also tried to make her sniff cocaine or methamphetamine from a key; when she tried to do so, her nose bled.  After such incidents, her vagina hurt; she thought there may have been times when he had sex with her that she did not remember.

On Monday morning, appellant went to work at 8:30 a.m.  When he returned at 7:00 p.m., he pinned the victim down on the bed and forced his penis into her mouth.  This lasted about five to 10 minutes.  She believed he would have hit her if she had refused.

On Tuesday morning, appellant went to work and left the victim alone in the hotel room all day.  He returned around 10:00 p.m. and "nothing happened" that night.

On Wednesday, appellant went to work.  When he returned around 8:30 p.m., he let the victim use his computer and went to sleep.  They did not have sex.  While appellant slept, the victim stayed up all night "trying to get out of there" by talking "on the computer" to the sister of "[T.M.]'s brother's girlfriend."  In an effort to get away from appellant, the victim also used his phone to text message a man in Oakland she had met online.  When appellant woke up, he read

the text messages on his phone.  Although he initially said she could leave, when he learned the man was not the victim's brother, he said he would not take her anywhere.  He told her, she could either stay at the hotel or call the police.  When the victim started screaming and crying, appellant told her to shut up or get out.  She then asked for his phone, which he gave her, and she called T.M.  Appellant dropped her off at the 7-Eleven at 6:00 a.m.

The victim said none of the sex she had with appellant was consensual.  She said she did not eat a lot while she was at the hotel with appellant.  She believed he was a pimp because he had a bunch of women's clothes and he said one of his "girls" was in jail.  She also said that all the girls whose pictures were on his computer were "his," and one was 17 years old.  She identified photos of marijuana inside the hotel room and photos of herself and appellant.  She believed appellant was selling drugs while they were together.

*Burns*, 2012 WL 6734688, *3-4 (footnote in original, brackets added).

The state appellate court summarized defense counsel's closing argument as follows:

In closing argument, the prosecutor argued that, in the video, the victim looked and sounded like an unsophisticated 14-year-old girl.  He also argued the victim's trial testimony was essentially consistent with her statements on the video, except, in the video, she said she and appellant never had consensual sex; and, at trial, she testified they had consensual sex when appellant first picked her up.

Defense counsel's closing argument asserted numerous discrepancies between the victim's trial testimony and her statements during the videotaped police interview.  Defense counsel also attempted to paint a positive picture of appellant, arguing that, in the video, the victim said appellant gave her a place to stay, bought her food, had consensual sex with her after she told him she was 19 years old, and drove her to the 7-Eleven after she made it clear she wanted to leave.  Defense counsel also argued based on the video, the victim, not appellant, placed the online ads, and at most, only two people came to the hotel where they drank, partied, and had consensual sex with appellant and the victim.

*Id.* at *4.

The state appellate court rejected Petitioner's claim that counsel rendered ineffective assistance by playing the videotape as follows:

Defense counsel could reasonably have sought to have portions of the videotape played for the jury to highlight the discrepancies between the victim's statements to the police and her testimony at trial, to paint a positive picture of appellant, and to create the

inference that the victim, not appellant, placed the online ads.  In addition, defense counsel could reasonably have believed that even extremely negative statements regarding appellant made by the victim in the videotape, but not repeated in her testimony, undermined the veracity of that testimony.[FN5]

[FN5:]  Examples of such testimony include statements that appellant sometimes put drugs in her drinks and tried to make her ingest cocaine or methamphetamine; she believed he sold drugs while they were together; and, after being drugged her vagina hurt, therefore he may have had sex with her at times she could not remember.

In any event, we conclude appellant has failed to demonstrate that defense counsel's conduct was prejudicial and, therefore, reject his incompetence of counsel claim.  The evidence of appellant's guilt was overwhelming.  Velasquez testified that, during his interview with the victim, her physical appearance and demeanor were consistent with her stated age of 14.  Based on this testimony alone, the jury could reasonably reject the defense's suggestion that appellant and his two friends had sex with her believing she was 19 years old.  The victim's trial testimony and videotaped statements were consistent and supported the charges of forcible rape and oral copulation.  In addition, the prosecution presented numerous photographs taken from appellant's cell phone showing the victim in sexually provocative poses, including one depicting her tongue on appellant penis, and similar images of the victim in the online ad, which advertised her services and gave appellant's cell phone number.  A suitcase containing very provocative women's clothing also was recovered from the hotel room.  This evidence amply supports the remaining procuring, pandering and pimping charges against appellant.

*Id.* at *5 (footnote in original).

### 1.  Applicable Law

An ineffective assistance of counsel claim under the Sixth Amendment is reviewed under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  Under the first prong, a petitioner must show "that counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  Because of the difficulties inherent in fairly evaluating counsel's performance, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant

by the Sixth Amendment." *Id.* at 687.  To satisfy the second prong under *Strickland*, a petitioner must establish that he was prejudiced by counsel's substandard performance.  *See Gonzalez v. Knowles*, 515 F.3d 1006, 1014 (9th Cir. 2008) (citing *Strickland*, 466 U.S. at 694).  Thus, to prevail on an ineffective assistance claim, the petitioner must demonstrate by a reasonable probability that but for the error of counsel, the outcome of the trial would have been different. *Strickland*, 466 U.S. at 694.

Under AEDPA, a federal court is not to exercise its independent judgment in assessing whether the state court decision applied the *Strickland* standard correctly; rather, the petitioner must show that the state court applied Strickland to the facts of his case in an objectively unreasonable manner.  *Bell v. Cone*, 535 U.S. 685, 699 (2002); *see also Cullen v. Pinholster*, 563 U.S. 170, 189-90 (2011) (federal habeas court's review of state court's decision on ineffective assistance of counsel claim is "doubly deferential").  The Supreme Court has specifically warned that: "Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under 28 U.S.C. § 2254(d).  When section 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether *there is any reasonable argument* that counsel satisfied *Strickland*'s deferential standard."  *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (emphasis added).

### 2.  Analysis

As the state appellate court found above, Petitioner's defense was based on attacking the victim's credibility.  This is evident from defense counsel's cross-examination of the victim, the playing of the victim's videotaped interview, and defense counsel's closing argument. Specifically, the state appellate court found that defense counsel could "reasonably have sought to have portions of the videotape played for the jury to highlight the discrepancies between the victim's statements to the police and her testimony at trial, to paint a positive picture of [Petitioner], and to create the inference that the victim, not [Petitioner], placed the online ads." *Burns*, 2012 WL 6734688, *5.  Furthermore, the state appellate court found that defense counsel could "reasonably have believed that even extremely negative statements regarding [Petitioner] made by the victim in the videotape, but not repeated in her testimony, undermined the veracity of

United States District Court
Northern District of California

that testimony." *Id.*  Respondent points out that

> . . . although the state court did not address petitioner's habeas petition in its decision, petitioner had submitted declarations from both of his trial counsel with respect to their decision to play the videotaped interview.  "Mr. Derieg and I made the decision to play for the jury the video recording of the police interview of the complaining witness because (1) it made her look like she was not answering truthfully, and (2) it showed bad police work in that two male officers were questioning a female rape victim."

Dkt. 12-1 at 16-17 (citing Dkt. 12, Ex. G (State Appellate Court Habeas Petition), Ex. A (Mortland Decl.) & Ex. B (Derieg Decl.)); *see also* Dkt. 12, Ex. L (State Supreme Court Habeas Petition), Exs. A & B (same)).  Thus, defense counsel had a tactical reason for presenting the jury the victim's videotaped interview—to show that the victim lacked credibility.

Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances.  *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).  Whether counsel's actions were indeed tactical is a question of fact considered under 28 U.S.C. § 2254(d)(2); whether those actions were reasonable is a question of law considered under 28 U.S.C. § 2254(d)(1).  *Edwards v. LaMarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).

Here, it is evident that defense counsel based their tactical choice to present the aforementioned defense on strategic considerations, and they made an informed decision after considering the overwhelming evidence against their client.  The prosecutor presented photos of the victim from Petitioner's cell phone and images from a website displaying those photos with his phone number, demonstrating he intended to prostitute the victim.  Clothing seen in the photos and matching the victim's description was found in Petitioner's room.  There was also physical evidence showing that the victim had injuries in her vaginal area.  No dispute existed as to the victim's and Petitioner's ages.  The victim testified in court that Petitioner forcibly raped her on one occasion and forced oral copulation on another occasion.  A photograph also showed the victim orally copulating Petitioner.  Under these circumstances, and given the strength of the prosecution's case, it was reasonable for defense counsel to attack the victim's credibility in an

10

effort to show she had willingly stayed with Petitioner, that he did not force any sex acts against her will, and that any evidence of pandering or prostitution was instigated by her, rather than by Petitioner. It was also reasonable for defense counsel to have believed that even extremely negative statements concerning Petitioner's uncharged crimes made by the victim in the videotape, but not repeated in her testimony, undermined the veracity of that testimony. Such a tactical decision by defense counsel deserves deference. *See Sanders*, 21 F.3d at 1456. However, as it turned out, defense counsel's efforts to pursue such a tactical decision were unsuccessful because the jury found the victim credible upon assessing the victim's credibility, both in person and in the videotaped interview, and to view her testimony in light of all the other evidence. Not only does the Court finds that defense counsel's actions to pursue such a defense deserved deference, but that their actions did not constitute deficient performance even if that defense was unsuccessful.

It is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the *Strickland* test if the petitioner cannot even establish incompetence under the first prong. *See Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998). Therefore, Petitioner has failed to show that the state appellate court's determination that counsel was not incompetent was contrary to or an unreasonable application of *Strickland*, or was based on an unreasonable determination of the facts.

Even if Petitioner had been able to establish incompetence under the first prong, this Court finds that defendant counsel's tactical decision did not undermine confidence in the outcome of the proceeding or cause prejudice to Petitioner. As the state appellate court found, in light of the strength of the prosecution's case due to the overwhelming evidence of Petitioner's guilt, Petitioner could not show a reasonable probability of a different outcome had defense counsel not acted as they did. *See Burns*, 2012 WL 6734688, *5.

Accordingly, the state appellate court reasonably found Petitioner had failed to meet his burden on his claim of ineffective assistance of counsel. *Id.* Therefore, this claim is DENIED.

### B.   Denial of Right to Counsel

Petitioner contends that the trial court violated his Sixth Amendment right to counsel of his choice by failing to advise him of his right to discharge his retained counsel. Dkt. 1 at 6-7. The

United States District Court
Northern District of California

state appellate court gave the following background and rejected Petitioner's claim as follows:

> Appellant was represented by retained counsel J. Robert Mortland and George M. Derieg. On June 7, 2011, after the verdicts were returned and the court found true his prior conviction allegation, appellant asked if he would be permitted to speak at sentencing about how he felt the trial went, because he wanted "all that to be on the record." The court responded it was "more than willing to let [appellant] say whatever you need to say, Sir." Sentencing was set for July 18.
>
> On July 18, 2011, the date set for sentencing, appellant appeared with Mortland. Appellant said he "wanted to have things brought to [the court's] attention" and then stated the following: "Everything that's going on now is violating my rights, man, with my lawyer and this courtroom." Appellant said he did not know what was going on and his lawyers had told him "nothing." He said there was a "smoke screen on me with me and my lawyer that's disrespectful." Appellant also said he was afraid evidence not presented at trial was going to be thrown away and he wanted to know how to preserve it. He said he did not trust his counsel to advise him when to file his appeal and counsel had not come to see him to talk about his appeal and had not explained the appeal process to him. When the court asked appellant, "What are you asking me to do, Sir?," appellant said he wanted his counsel to come to see him in jail and explain the appeal process to him. When the court asked appellant if he wanted a continuance of the sentencing hearing, appellant responded, "Yes." The court also said, "a lot of what you told me is you're not happy with your lawyers" and stated it was inclined to continue the sentencing if that's what appellant wanted; appellant responded affirmatively. When the court asked appellant if a one-month continuance would be enough time, appellant asked if he could question his attorney; a discussion was then held off the record. Thereafter, Mortland told the court appellant adamantly wanted the sentencing in two weeks. Mortland also stated, "I will make sure we do visit him and get an appeal started in his case." Sentencing was continued to August 2.
>
> At the August 2, 2011 sentencing hearing, the court noted it had received a letter from appellant requesting an additional continuance for sentencing; the request was denied. The court noted that appellant had been frustrated throughout the trial process and stated it was giving him "an opportunity to tell me whatever you need to tell me if you need to tell me anything at all." Appellant began by saying, "I said everything I want to say in my letter to you." He then said this was his first trial experience and it was unfair to him. He said "a lot could have been done on this case on [his] lawyer's part," but appellant did not hold anyone responsible. Although he

had been angry at his lawyers, he was no longer angry. He said he did not trust that his lawyers would timely file his appeal paperwork, but reiterated he was not angry at anyone and was going to get his "justice" in "round two." When the court asked if appellant wanted to put anything else on the record, appellant said, "No." The court commented that the problem with appellant's case was that the prosecution had strong evidence and said, "It's always easy after a case is done to Monday morning quarterback and say this could have happened." The court proceeded to sentence appellant. Thereafter, it noted defense counsel had that day filed a notice of appeal in the case.

"While a defendant may discharge appointed counsel only if that lawyer is rendering inadequate representation or there exists an irreconcilable conflict between counsel and client [citation], he or she may discharge retained counsel for any reason. [Citation.] The right to discharge retained counsel is not, however, absolute. The trial court may deny a request to discharge retained counsel 'if discharge will result in "significant prejudice" to the defendant [citation], or if it is not timely, i.e., if it will result in "disruption of the orderly processes of justice" [citations].' [Citation.]" (*People v. Keshishian* (2008) 162 Cal. App. 4th 425, 428.) "[A] trial court's duty to permit a defendant to state his reasons for dissatisfaction with his attorney arises 'when the defendant in some manner moves to discharge his current counsel . . . .' [Citation.]" (*People v. Lara* (2001) 86 Cal. App. 4th 139, 157.) The defendant is "not required to make a proper and formal legal motion, 'but at least some clear indication . . . that he wants a substitute attorney . . . ' [Citation.]" (*Ibid.*) "Mere grumbling" about counsel's failures does not constitute a request to discharge counsel. (*People v. Lee* (2002) 95 Cal. App. 4th 772, 780.)

Appellant appears to argue his two oral statements and his letter to the court asserting he did not trust his attorneys and they were dishonest, did not respect him, did not keep him informed, played games with him, were unqualified, and did no more than get him convicted, sufficiently indicated he wanted to discharge his current counsel.

At the July 18, 2011 hearing, appellant expressed dissatisfaction with his counsel, but when the court asked him what he wanted the court to do, he indicated only that he wanted the sentencing hearing continued and asked to speak to counsel. Following an unreported discussion, Mortland stated appellant wanted a two-week continuance and counsel would make sure to visit him and begin the appeal process. The court then continued the sentencing hearing pursuant to appellant's request. At no time during the July 18 hearing did appellant clearly indicate a desire to discharge his current counsel.

13

> Similarly, appellant expressed dissatisfaction with his counsel in his July 20, 2011 letter to the court and again at the August 2 sentencing hearing, but he made very clear that although he had been angry at his lawyers, he was no longer angry. Appellant said he did not trust that his lawyers would timely file his appeal paperwork, but the court confirmed that defense counsel had filed appellant's notice of appeal. Moreover, when the court asked if appellant wanted to put anything else on the record, appellant said, "No." Viewed in context, appellant's articulations of his apparent unhappiness with his counsel were more akin to "mere grumbling" than a clear indication of his desire to discharge counsel. No error is demonstrated.

*Burns*, 2012 WL 6734688, *6-8.

## 1. Applicable Law

The Sixth Amendment right to counsel includes a qualified right of the criminal defendant to have the counsel of his choice if he can pay for it and counsel is willing to serve. *See Wheat v. United States*, 486 U.S. 153, 159, 164 (1988). The right is qualified in that it "may be overcome by . . . 'a showing of a serious potential for conflict,'" or that the proposed choice will interfere with the integrity of the proceeding. *United States v. Stites*, 56 F.3d 1020, 1024, 1026 (9th Cir. 1995) (quoting *Wheat*, 486 U.S. at 164).

The court has "recognized that the purpose of providing assistance of counsel 'is simply to ensure that criminal defendants receive a fair trial,' [citation], and that in evaluating Sixth Amendment claims, 'the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.' [Citation.]" *Wheat*, 486 U.S. at 159. "Thus, while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Id.* Whether counsel is privately retained or appointed, the Sixth Amendment does not guarantee a "'meaningful relationship' between an accused and his counsel." *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983).

## 2. Analysis

Petitioner claims that the trial court failed to advise him that he could discharge retained

14

United States District Court
Northern District of California

counsel; however, the Supreme Court has not clearly established that such an advisement is required, which is fatal to his claim.  28 U.S.C. § 2254(d)(1); *see Harrington*, 562 U.S. at 101 ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by th[e] [Supreme] Court.").

In addition, the trial court's factual findings that Petitioner already knew of his right to substitute counsel, and that he never sought to discharge retained counsel are entitled to a presumption of correctness under 28 U.S.C. § 2254.  *Dyer v. Calderon*, 151 F.3d 970, 975 (9th Cir. 1998) ("So long as the fact-finding process is objective and reasonably explores the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness.").  To rebut this presumption, a petitioner must present clear and convincing evidence establishing that the state court's finding was erroneous.  *See* 28 U.S.C. § 2254(e)(1); *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004)  ("Once the state court's fact-finding process survives this intrinsic review [,] . . . the state court's findings are dressed in a presumption of correctness [ ]" and may be overturned only if new evidence presented for the first time in federal court "amounts to clear and convincing proof that the state-court finding is in error.").  Here, Petitioner has failed to demonstrate any flaw in the trial court's fact-finding process, or to present any evidence, let alone clear and convincing evidence, to support his claim.  As such, the Court may properly defer to the trial court's findings, as further explained by the following summary of the record below.

On January 24, 2011, Petitioner filed a *pro se* motion for substitution of appointed counsel, alleging numerous grounds.  CT 261-265.  On February 10, 2011, Attorney Mortland substituted in as retained counsel.  CT 271.  On May 17, 2011, at the start of trial, Petitioner withdrew his motion for substitution of appointed counsel because he had retained private counsel, Attorneys Mortland and Derieg.  CT 293; RT 11-12.

Petitioner never mentioned any dissatisfaction with his retained counsel until the trial court and the parties were discussing the date for sentencing, and at that point, Petitioner stated he wanted to state matters on the record at the sentencing hearing.  RT 343-344.  On July 18, 2011,

the date set for sentencing, Petitioner stated at length his concerns regarding his defense counsel. RT 346-350.  Yet, when the trial court asked what he wanted, Petitioner said he wanted to continue sentencing so that he could have the appeal process explained to him and be sure his appeal was timely filed.  RT 350-351.  The record shows that after a discussion with Defendant, Attorney Mortland stated, "If we can set it over two weeks . . . [Petitioner] is adamant that he wants it [in] two weeks.  I will make sure we do visit him and get an appeal started in his case." RT 353.  The trial court agreed to Petitioner's request, and continued the sentencing hearing to August 2, 2011.  RT 351-354.  On July 26, 2011, the trial court received a letter from Petitioner dated July 20, 2011, in which he: (1) apologized to the judge for "disrespecting" him at the July 18, 2011 hearing, (2) explained his frustrations with his defense counsel for not diligently representing him, (3) complained that his defense counsel had not yet filed his notice of appeal, and (4) requested another continuance of his August 2, 2011 court date until his "concerns" were "cleared up."  CT 445-446.  Again, Petitioner did not suggest in his letter that he wanted new counsel for sentencing.  *See id.*  Indeed, he never expressed any concerns about the sentencing process itself, and there were no other matters pending.  *See id.*  At the sentencing on August 2, 2011, Petitioner's request for a continuance was denied.  RT 356.  Petitioner then reiterated his frustrations with his defense counsel and the trial, and emphasized his desire to pursue an appeal. RT 358-360.  At the conclusion of sentencing, the trial court stated Petitioner's counsel had filed his notice of appeal.[7]  RT 365.

In the absence of any clear indication of Petitioner's desire to discharge his retained counsel, this Court finds unavailing Petitioner's claim that the trial court should have advised him he could do so.  Moreover, as outlined in the summary above, the record shows that Petitioner had sought substitution of appointed counsel, and then retained private counsel at the outset of the case.  The proceedings at sentencing show Petitioner was capable of addressing the trial court and

---

[7] In his traverse, Petitioner argues that in support of his state appellate court habeas petition, he submitted his declaration dated October 18, 2012 (more than a year after sentencing) "explain[ing] that he wanted to discharge defense counsel but did not do so because they told him it was too late."  Dkt. 28 at 20-21 (citing Dkt. 12, Ex. G (State Appellate Court Habeas Petition), Ex. C).  However, it matters not what Petitioner stated in the aforementioned declaration if he did not raise such concerns before the trial court at his August 2, 2011 sentencing, as shown above.

United States District Court
Northern District of California

1   expressing his views.  Had he wanted to discharge his retained counsel prior to sentencing

2   sentencing, he would have said so.  Such was not the case here.

3          In sum, Petitioner has not rebutted the trial court's findings that he already knew of his

4   right to substitute counsel, and that he never sought to discharge retained counsel.  Therefore, the

5   Court will defer to the trial court's findings.   *See Buckley v. Terhune*, 397 F. 3d 1149, 1160-61

6   (9th Cir. 2005), *affirmed on other grounds by* 441 F.3d 688 (9th Cir.2006) (en banc) (petitioner

7   did not rebut presumption of correctness where, despite evidence to the contrary, there was

8   sufficient evidence from which the state court could reasonably conclude that petitioner had

9   agreed to sentence he received).  In finding that no error was demonstrated by the trial court's

10  findings that appellant made no clear indication of his desire to discharge his retained counsel, the

11  appellate court rejected Petitioner's claim of a Sixth Amendment violation.  This Court finds that

12  the appellate court's decision was not objectively unreasonable.

13         Accordingly, Petitioner's claim of a Sixth Amendment violation is DENIED.

14  **C.    Instructional Claim**

15         Pursuant to CALCRIM No. 318, the trial court instructed the jury as follows:

16                 You have heard evidence of statements that a witness made before
                   the trial.  If you decide that the witness made those statements, you
17                 may use those statements in two ways:  [¶]  1. To evaluate whether
                   the witness's testimony in court is believable;  [¶]  AND  [¶]  2. As
18                 evidence that the information in those earlier statements is true.

19  CT 391.

20         Petitioner contends the trial court violated his right to a fair trial and due process by

21  instructing the jury with CALCRIM No. 318.  Dkt. 1 at 6, 8.  As shown above, CALCRIM No.

22  318 informs the jury that if it decides that a witness made prior statements, it may use those

23  statements to evaluate whether the witness's testimony in court is believable and to determine

24  whether the earlier statements are true.  However, Petitioner specifically challenges the trial

25  court's instructing the jury with CALCRIM No. 318 because the instruction endorsed the veracity

26  of the victim's pre-trial statement, and implicitly her trial testimony, reducing the prosecution's

27  burden of proof.  Dkt. 1 at 6, 8; Dkt. 28 at 30-31.  He states as follows:

28                 The jury was instructed with CALCRIM [No.] 318 that it could

United States District Court
Northern District of California

17

1  
2  
3  
4  

conclude that a witness's pretrial statements were true. Only victim Doe made any pre-trial statements, all of them implicating Petitioner in the charged crimes or with uncharged, additional crimes. CALCRIM [No.] 318 instructed the jury her statements were true, or more likely to be true, because she had made them. By implication, it also impermissibly suggested to the jury that [victim] Doe's testimony [at trial], largely consistent with her pre-trial statements, were true.

5   Dkt. 1 at 6, 8. Petitioner adds, "This violated [his] rights to due process and a fair trial under the

6   Sixth and Fourteenth Amendments to the United States Constitution which require the prosecution

7   to bear the burden of proving its case beyond a reasonable doubt." Dkt. 28 at 31.

8        The state appellate court rejected Petitioner's claim as follows:

9  
10  
11  
12  
13  
14  
15  
16  
17  

Appellant argues CALCRIM No. 318 unambiguously informs the jury a witness's pretrial statements are to be viewed as truthful because they were made. Claims similar to appellant's have been rejected by other appellate courts. (*See People v. Tuggles* (2009) 179 Cal. App. 4th 339, 363-366; *Hudson, supra*, 175 Cal. App. 4th at pp. 1027-1029; *People v. Golde* (2008) 163 Cal. App. 4th 101, 119-120; *People v. Felix* (2008) 160 Cal. App. 4th 849, 859 (*Felix*). *Hudson* reasoned, "By stating that the jury 'may' use the out-of-court statements, the [CALCRIM No. 318] instruction does not require the jury to credit the earlier statements even while allowing it to do so. [Citation.] Thus, we reject defendant's argument that CALCRIM No. 318 lessens the prosecution's standard of proof by compelling the jury to accept the out-of-court statements as true." (*Hudson, supra*, 175 Cal. App. 4th at p. 1028.)

18  
19  
20  
21  
22  
23  
24  

The jury was also instructed with CALCRIM No. 220, which told the jury it could find appellant guilty only if it concluded beyond a reasonable doubt that he committed the offense in light of "all the evidence" and CALJIC No. 226, which told the jury it could accept or reject any testimony and could consider whether the witness's prior statement was consistent or inconsistent with his or her testimony. Taken together, the instructions provide proper guidance as to how the jury may use witness testimony, and do not encourage the jury to believe it is bound to find a witness's out-of-court statement or trial testimony true. (*Felix, supra*, 160 Cal. App. 4th at p. 859.) We reject appellant's instructional error claim.

24   *Burns*, 2012 WL 6734688, *8.

25       **1.   Applicable Law**

26        A challenge to a jury instruction solely as an error under state law does not state a claim

27   cognizable in federal habeas corpus proceedings. *See Estelle v. McGuire*, 502 U.S. 62, 71-72

28

1   (1991).  To obtain federal habeas relief for error in the jury charge, Petitioner also must show

2   actual prejudice from the error, i.e., that the error had a substantial and injurious effect or influence

3   in determining the jury's verdict.  *See Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (citing

4   *Brecht*, 507 U.S. at 637).  The error may not be judged in artificial isolation, but must be

5   considered in the context of the instructions as a whole and the trial record.  *See Estelle*, 502 U.S.

6   at 72.

7                  **2.  Analysis**

8          Given the literal reading of CALCRIM No. 318, the state appellate court's conclusion that

9   CALCRIM No. 318 was not misleading, nor did it compel the jury to find that the prior statements

10   were true, is reasonable.  *See Burns*, 2012 WL 6734688, *8.  As explained above, the instruction

11   permitted the jury to consider the pre-trial statements in assessing the witness's credibility at trial

12   and as evidence that the information in them was true, but it did not mandate that the jury reach

13   any particular conclusion.  *See* CT 391 (CALCRIM No. 318).  As the state appellate court noted,

14   the jury was also instructed with CALCRIM No. 226, which gave a lengthy list of factors to

15   consider in evaluating a witness's testimony.  CT 386-387.  CALCRIM No. 226 also explained to

16   the jury as follows:

17                     You alone, must judge the credibility or believability of the
18                    witnesses.  In deciding whether testimony is true and accurate, use
                    your common sense and experience.  You must judge the testimony
19                    of each witness by the same standards, setting aside any bias or
                    prejudice you may have.  You may believe all, part, or none of any
20                    witness's testimony.  Consider the testimony of each witness and
                    decide how much of it you believe.

21   CT 386.  The trial court further instructed the jury with CALCRIM No. 200, which, in part,

22   directed the jury to "[p]ay careful attention to all of these instructions and consider them together."

23   CT 377.  Finally, the trial court instructed the jury with CALCRIM No. 220 that Petitioner was

24   "presumed to be innocent," and that the prosecution bore the burden of proving each charge

25   beyond a reasonable doubt.  CT 382.  The jury is presumed to follow its instructions.  *See Weeks v.*

26   *Angelone*, 528 U.S. 225, 234 (2000).  Viewing the instructions as a whole and in light of the entire

27   trial, Petitioner's claims that CALCRIM No. 318 instructed the jury to find the victim's pretrial

28   statements to be true, and impermissibly lessened the prosecution's burden of proof, are without

United States District Court
Northern District of California

19

merit.  Moreover, the state appellate court noted that several state cases had rejected the same claim made by Petitioner.  *See Burns*, 2012 WL 6734688, *8.  Its rejection of Petitioner's claim was not objectively unreasonable.  Finally, because Petitioner cannot demonstrate actual prejudice from an instruction error, *see Brecht*, 507 U.S. at 637, the state appellate court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court law.

Accordingly, the state appellate court reasonably rejected Petitioner's claim relating to CALCRIM No. 318.  Therefore, Petitioner is not entitled to habeas relief on this claim, and it is DENIED.

**IV.    CERTIFICATE OF APPEALABILITY**

No certificate of appealability is warranted in this case.  For the reasons set out above, jurists of reason would not find this Court's denial of Petitioner's claims debatable or wrong.  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

**V.    CONCLUSION**

For the reasons outlined above, the Court orders as follows:

1.    All claims from the petition are DENIED, and a certificate of appealability will not issue.  Petitioner may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

2.    The Clerk of the Court shall enter judgment, terminate any pending motions and close the file.

IT IS SO ORDERED.

Dated: February 16, 2016

_____
YVONNE GONZALEZ ROGERS
United States District Judge